**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

CROOKSVILLE FAMILY CLINIC, INC.,

      Plaintiff,                 :      Case No. 2:16-cv-1145

      -vs-                      Judge Sarah D. Morrison
                                 Magistrate Judge Kimberly A. Jolson

QUEST DIAGNOSTICS, INC.,
*et al.*,
                                 :

      Defendants.

## OPINION AND ORDER

This matter is before the Court upon Defendants Quest Diagnostics, Inc., MedPlus, Inc., and David Mills' collective Motion for Summary Judgment (ECF No. 38), Plaintiff Crooksville Family Clinic, Inc.'s Brief in Opposition to Defendants' Motion for Summary Judgment (ECF No. 42), and Defendants' Reply Memorandum in Support of their Motion for Summary Judgment (ECF No. 43). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion.

I.      **FACTS**

From 1987 until 2012, Plaintiff Crooksville Family Clinic, Inc. ("Plaintiff" or "Clinic") was a rural family clinic in Crooksville, Ohio. (Mumma Depo., 19, ECF No. 31). Dr. Paul Mumma, D.O., was Plaintiff's president and primary practitioner during that time. (*Id.* at 19–21). Because Plaintiff was designated as a rural health clinic through the federal government, it received reimbursement based on an enhanced fee schedule from Medicare and Medicaid for treatment of patients. (*Id.* at 41). This required different billing processes and rules than the general Medicare and Medicaid programs. (*Id.*). In 2011, rural healthcare claims constituted 60

to 70 percent of Plaintiff's primary care practice. (*Id.*).

Defendant Quest Diagnostics, Inc. ("Quest") marketed and sold two interfaced products under the "Care360" label: (1) the electronic health records ("EHR") product, developed and supported by MedPlus, Inc.; and (2) the practice management system ("PMS"), developed and supported by Kareo. (Mills Depo., 22, 26–27, ECF No. 36). At the time of the lawsuit, Defendant MedPlus, Inc. was a wholly-owned subsidiary of Quest. (*Id.* at 14). Quest was a reseller of Kareo's PMS service. (*Id.* at 38). The EHR product maintained and imported patient data records, while the PMS service allowed for scheduling, billing, and sending claims to payors. (*Id.* at 16, 22, 27). For purposes of this Opinion, the Court will refer to both products collectively as the "Care360 Program" unless otherwise noted.

In early 2011, David Mills, a technology account executive with Quest, met with Cheryl Crowder, Administrative Director for the Physicians Group of Southeast Ohio ("PGSEO"),[1] to discuss the Care 360 Program. (Crowder Depo., 55, ECF No. 33). Upon learning that PGSEO was not interested in purchasing a billing system as a single entity, Mr. Mills inquired about whether Plaintiff might be interested in the Care360 Program. (*Id.* at 57). Dr. Mumma was part of the PGSEO and Ms. Crowder had been handling the private insurance billing for Plaintiff since 2001. (*Id.* at 16). According to Ms. Crowder, "I told them that that was not the office that they wanted to start with. It's not  - - it's not a very current office, as far as technology. . . . I know their office manager was older and didn't have the technical knowledge that some of our younger office managers did, and I didn't feel that that was a good place for them to start." (*Id.* at 57–58).

---

[1] PGSEO is a 34-physician primary care practice with locations in several rural Ohio counties. (Crowder Depo., 14, ECF No. 33).

Nevertheless, shortly thereafter, Mr. Mills met with Barbara Anders, Plaintiff's administrator and officer manager, to talk about the Care360 Program. (Anders Depo., 43, ECF No. 35). For nearly 25 years, Ms. Anders managed the cash flow, managed personnel, ordered supplies, and oversaw billing for Plaintiff. (Mumma Depo., 27–28; Anders Depo., 11). Dr. Mumma described Ms. Anders as handling "the business side of things" for the Clinic. (Mumma Depo., 65).

According to Ms. Anders, she stressed several times in her initial discussions with Mr. Mills that Plaintiff was a rural health clinic, so any billing program they used had to be able to bill for rural healthcare claims. (Anders Depo., 44, 55). When asked by Ms. Anders if the Care360 Program's billing tool could handle rural healthcare billing, Mr. Mills reached out to Kareo via e-mail. (Mills Depo., 50–51). Matt Kelly, an account executive with Kareo, responded to Mr. Mills on June 6, 2011 as follows:

> We do have many different types of clients submitting UB04[2] claims today but I am not away [sic] of any Rural health clinics that are doing this today. I checked with our support team and they have sent me the following response.
>
> \*\*\*
>
> If Kareo is not yet supporting your specialty, there are 2 options for you:
>
> 1. If you're willing to partner with us as we develop support for your type or specialty of institutional billing, please contact our support team . . . . They will work with you to help you submit institutional claims. Please note that as a BETA customer, there may be additional fields the Kareo engineering department has to design to assist you, thus the process could take some time. Each specialty is different in terms of timelines, thus we don't have a definitive ETA, but these types of features usually take between 4-8 weeks to develop. The first step is to talk to customer service; they will assist you with next steps.

(Pl. Ex. 2, ECF No. 36).

---

[2] "UB" stands for universal billing and refers to the format of the claim. (Mills Depo., 104–105).

After receiving this e-mail from Kareo, Mr. Mills relayed to Ms. Anders that rural healthcare billing "wouldn't be an issue, that they could support that." (Mills Depo., 52–53). Mr. Mills did not disclose the specific contents of the e-mail to anyone at the Clinic. (*Id.* at 121). According to Mr. Mills, Ms. Anders participated in a Kareo webinar shortly thereafter and Kareo responded similarly regarding her question about Care360's rural healthcare billing capability. (*Id.* at 52, 64–65). While Ms. Anders acknowledged in her deposition that she probably asked about rural healthcare billing during a Kareo webinar, she recalled that being after the contract was signed. (Anders Depo., 108–13).

Sometime in the summer of 2011, Mr. Mills presented the Care360 Program to Plaintiff's staff. (Pease Depo., 23, ECF No. 32). According to Ms. Anders, she again explained to Mr. Mills during this presentation "at least four or five times" that Plaintiff was a rural health clinic and the Care360 Program would have to be able to perform rural healthcare billing, that "was the main factor [they] had to have with [the] product." (Anders Depo., 47–48). Mr. Mills responded each time that "there would be no problem." (Anders Depo., 48; Mills Depo., 52). Ginger Pease, Plaintiff's assistant office manager, reiterated the same question during the demonstration and Mr. Mills' response was the same. (Pease Depo., 18–19). Mr. Mills had no experience with rural healthcare billing up to that point. (Mills Depo., 57).

Reflectively, Dr. Mumma believed Mr. Mills' affirmations about the Care360 Program's billing capabilities were false due to Mr. Mills being "possibly misinformed." (Mumma Depo., 73). However, he did note that Mr. Mills "expressed no reservation." (*Id.*). Similarly, Ms. Anders testified that she did not think Mr. Mills believed his assurances to be false. (Anders Depo., 93). Rather, she thought "David believed it could handle it." (*Id.* at 93, 131). Ms. Pease also did not think Mr. Mills made any intentionally false statements, she just thought he did not know much

about rural healthcare billing. (Pease Depo., 75–76).

On August 31, 2011, Plaintiff executed the Care360 License and Services Agreement ("Care360 Agreement"). Ms. Anders signed the Care360 Agreement as the representative of Plaintiff after both herself and Dr. Mumma had an opportunity to review it. (Mumma Depo., 99; Anders Depo., 88, 92). Ms. Anders and Dr. Mumma testified that they did not recall Mr. Mills stating that they could not negotiate the terms of the Agreement before signing it. (Mumma Depo., 100; Anders Depo., 92–93). There is no dispute that Mr. Mills was paid a commission or bonus for each sale of the Care360 Program. (Mills Depo., 63).

Under the terms of the Care360 Agreement, Plaintiff contracted to license and pay for the Care360 Program and related services. (*See generally* Care360 Agreement, Defs. Ex. 2, ECF No. 31). The Agreement was broken into two subparts: (1) the EHR License and Services Agreement (p. 1–15); and (2) the PMS Customer Subscription Agreement (p. 15–17). (*Id.*). Relevant to this litigation, within the PMS Customer Subscription portion of the Care360 Agreement is an "Exclusion of Damages and Limitation of Liability" clause, which states:

> (a). Exclusion of Certain Damages. EXCEPT FOR A VIOLATION OF OUR OR KAREO'S INTELLECTUAL PROPERTY RIGHTS OR FOR THE INDEMNITIES BELOW, NEITHER PARTY NOR KAREO IS LIABLE FOR ANY INDIRECT, SPECIAL, OR CONSEQUENTIAL DAMAGES

> (b). (INCLUDING WITHOUT LIMITATION, COSTS OF DELAY, LOSS OF DATA OR INFORMATION, AND ANY FAILURE OF DELIVERY OF THE PMS SERVICES).

> (c). Limitation of Liability. OUR LIABILITY FOR ALL DAMAGES RELATING TO THIS CARE360 PMS AGREEMENT (WHETHER IN CONTRACT, TORT OR OTHERWISE) DOES NOT EXCEED THE ACTUAL AMOUNT PAID BY YOU WITHIN THE PRECEDING 12 MONTHS UNDER THIS AGREEMENT.

(*Id.* ¶ 6, p. 16). The Agreement also provided, "This Agreement constitutes the entire agreement between the parties with respect to the PMS Services, and supersedes all prior or

contemporaneous negotiations or agreements, whether oral or written, related to this subject matter." (*Id.* ¶ 9, p. 17). According to Dr. Mumma, there were no other written or oral agreements between Plaintiff and Quest pertaining to billing services. (Mumma Depo., 93–94).

The Care360 Program was installed in October 2011. (Mills Depo., 89–90; Anders Depo., 71; Pease Depo., 57). Almost immediately, Plaintiff began experiencing problems with billing and claims processing. (Mumma Depo., 82). Specifically, Plaintiff was unable to bill and collect any reimbursement from Medicare and Medicaid for rural healthcare services rendered to its patients. (Mumma Depo., 81–82; Pease Depo., 57–58). Over the course of the next several months, Ms. Anders talked to Kareo's customer support approximately two to three times a day. (Anders Depo., 98). On several occasions, Ms. Anders was told that the problem was being corrected or that the Care360 Program was being modified to fit Plaintiff's need. (*Id.* at 132). However, there were also occasions where she was a told that what she was asking for could not be done. (*Id.* at 132–33).

Mr. Mills went out to the Clinic on several occasions to assist with trouble-shooting. (Mumma Depo., 82; Mills Depo., 83; Anders Depo., 53). During those visits, Mr. Mills assured Ms. Anders that the problems with rural healthcare claims were being addressed and remedied. (Anders Depo., 53). According to Dr. Mumma, Mr. Mills worked diligently to try to fix the issues. (Mumma Depo., 74). However, as months went on, Ms. Anders recalled, "you got to where you weren't really believing what [Mr. Mills] was saying because he had told you many times that they were going to fix this; that it was going to be corrected. And it wasn't happening." (Anders Depo., 54). Ms. Anders believed Mr. Mills was doing all he could to help but the root of the issue was not his problem to correct or fix. (*Id.*).

During this time, Mr. Mills was in constant contact with Kareo to make sure they were

working with Plaintiff. (Mills Depo., 69). However, Mr. Mills did not directly relay any specific information he received from Kareo to Plaintiff. (*Id.* at 138, 142). For example, he did not forward on any e-mails between himself and Kareo's support staff about the Care360 Program's ability to support rural healthcare billing. (*Id.* at 143–45). According to Mr. Mills, "[t]here were a few times that he was given the impression that things were smoothing out and beginning to work, but then it always seemed like there was a subsequent issue." (*Id.* at 69). There was a constant back and forth with Kareo about whether the billing issue could or could not be fixed. (*Id.* at 147). Mr. Mills acknowledged that his lack of knowledge of rural healthcare billing may have contributed to him feeling somewhat misled by Kareo during his initial correspondence with Kareo. (*Id.* at 146).

Ultimately, Plaintiff was never able to use the Care360 Program to effectively bill and collect for its rural healthcare services. (Mumma Depo., 164). In an attempt to stay afloat with the cash flow problems that resulted, Dr. Mumma opened personal lines of credit and borrowed funds. (*Id.* at 45). In February 2012, Mr. Mills reached out to Quest's sales director, John Rea, to let him know about the billing issue and the financial problems faced by Plaintiff. (Mills Depo., 95–96; Pl. Exs. 8–9, ECF No. 36). Quest subsequently waived three months of Plaintiff's fees. (Mumma Depo., 92).

On April 1, 2012, Ms. Crowder took over all billing for Plaintiff through PGSEO. (*Id.* at 35). In May 2012, Plaintiff terminated the Care360 Agreement and Defendants ceased providing services to Plaintiff. (*Id.* at 140). Because Dr. Mumma was not paid for Medicare or Medicaid rural healthcare claims from approximately November 2011 through the middle of 2012, there was limited cash flow for Plaintiff to meet payroll and continue to operate. (*Id.* at 39–40). Consequently, in September 2012, Dr. Mumma sold his practice to Genesis Medical Group and

became an employee therein.[3] (*Id.* at 29–30).

On October 28, 2016, Plaintiff filed a complaint in the Perry County Court of Common Pleas alleging claims for (1) breach of contract; (2) fraud in the inducement; (3) fraud/negligent and/or intentional misrepresentation; (4) breach of verbal/implied contract; and (5) unconscionable exculpatory clause. (ECF Nos. 3, 8). On December 6, 2016, Defendants removed the case to this Court pursuant to 28 U.S.C. §§ 1332, 1441. (ECF No. 7). Defendants filed a joint Answer on December 13, 2016. (ECF No. 10).

On January 31, 2018, Defendants moved for summary judgment on all of Plaintiff's claims. (ECF No. 38). Plaintiff filed its Brief in Opposition on February 21, 2018. (ECF No. 42). Defendants filed their Reply on March 7, 2018. (ECF No. 43). Within their Reply Brief, Defendants also request the Court strike three affidavits attached to Plaintiff's Brief in Opposition. Defendants' Motion for Summary Judgment is now ripe for review.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When

---

[3] Crooksville Family Clinic Incorporated still exists as an entity but it is not operating as a business. (Mumma Depo., 102).

evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

## III.    ANALYSIS

### A.    Request to Strike Affidavits

In filing their Brief in Opposition, Plaintiffs attached affidavits of Dr. Mumma, Ms. Anders, and Ms. Pease. (ECF Nos., 42-1, 42-2, 42-6). The affidavits are based on each individual's review of Mr. Mills' June 6, 2011 e-mail correspondence with Matt Kelly (Pl. Ex. 2, ECF No. 36), which was not previously made available to them prior to or during their depositions for this litigation. In their Reply, Defendants argue that the affidavits should be stricken or given no weight since they contradict prior deposition testimony, contain legal conclusions, and are based on a lack of personal knowledge.

Pursuant to Fed. R. Civ. P. 56(c)(4), affidavits "must be made on personal knowledge, [and] set out facts that would be admissible in evidence." Personal knowledge is not "conclusory assertions," *Reed v. Procter & Gamble Mfg. Co.*, 556 Fed. Appx. 421, 427 (6th Cir. 2014), or "argumentative interpretations of statements of fact." *Briggs v. Potter*, 463 F.3d 507, 512 (6th Cir. 2014). "It is [also] well settled that courts should disregard conclusions of law (or 'ultimate

fact') found in affidavits submitted for summary judgment." *Harrah's Entertainment, Inc. v. Ace American Ins. Co.*, 100 Fed. Appx. 387, 394 (6th Cir. 2004) (internal quotations omitted). Likewise, "after a motion for summary judgment has been made, a party may not file an affidavit that contradicts his earlier sworn testimony . . . unless the party opposing summary judgment provides a persuasive justification for the contradiction." *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (internal quotations and citation omitted). "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to create a sham fact issue." *Aerel, S.R.L. v. PCC Airfoils, LLC*, 448 F.3d 899, 908 (6th Cir. 2006) (internal quotations omitted). An affidavit that fails to satisfy these requirements is subject to a motion to strike and will not be considered by the Court upon ruling on a motion for summary judgment. *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F. Supp. 2d 948, 954 (S.D. Ohio 2000). However, because "the Court should use 'a scalpel, not a butcher knife[,]' . . . it is appropriate for the Court to strike [only] portions of affidavits that do not satisfy the requirements." *Giles v. Univ. of Toledo*, 241 F.R.D. 466, 470 (N.D. Ohio 2007) (quoting *Perez v. Volvo Car Corp.*, 247 F.3d 303, 315–16 (1st Cir. 2001)).

After a thorough review, the Court finds that the contested affidavits should be stricken in part and admitted in part as outlined below. Accordingly, the Court only considered the affidavits pursuant to the following rulings in deciding Defendants' Motion for Summary Judgment.

### 1. Dr. Paul Mumma Affidavit

Defendants do not contest paragraphs 1–8, 12, and 13 of Dr. Mumma's affidavit (ECF No. 42-1) and the Court finds that these paragraphs are legally sufficient. Accordingly, these paragraphs are admitted.

In paragraph 9, Dr. Mumma states, "I believed that Kareo was a part of Defendants." By

contrast, in his deposition he stated, "I don't understand the business relationship between Quest and Kareo." (Mumma Depo., 63). That portion of the affidavit is stricken as contradictory without justification. Later in that same paragraph, Dr. Mumma states "Kareo's involvement occurred after the contract was signed for purchase of the Care360 Program and we went live with the software." Defendants argue that this contradicts Dr. Mumma's earlier testimony where he stated multiple times that he did know whether any Clinic employees talked to anyone other than Mr. Mills before the software went live. (*Id.* at 78–80). The Court agrees with Defendants. This portion of paragraph 9 is also stricken as contradictory without justification. The first sentence of paragraph 9 is admitted as consistent with prior deposition testimony.

Paragraph 10 is stricken starting at "relied" and ending at "Mr. Mills, and." The included language is an ultimate issue of fact that goes to Plaintiff's fraud claims. The rest of Paragraph 10 is admitted. Defendants argue that Dr. Mumma's statement in paragraph 11, "the Care360 did not function for rural health care billing" is based on a lack of personal knowledge. The Court agrees. While Dr. Mumma can and did testify that the Program did not work for Plaintiff's rural healthcare billing, there is nothing to support that he has personal knowledge that it did not work for all rural healthcare billing. That clause is stricken. The rest of Paragraph 11 is admitted as consistent with prior deposition testimony.

In paragraph 14, Dr. Mumma states, "When I read the e-mail, I was outraged to learn for the first time that Defendants knew at the time representations and promises were being made to Plaintiff that the Care 360 program was not able to handle rural health care billing." The Court finds it is appropriate to admit that Dr. Mumma was outraged when he read the e-mail but the remainder of the paragraph is stricken up until the word "Further." The e-mail is evidence in the record and is the best evidence of what it contains. Fed. R. Evid. 1002. Also, Dr. Mumma does

not have personal knowledge as to what Defendants knew at the time of the contract discussions. However, the last two sentences beginning with "Further" are admitted as consistent with previous deposition testimony.

In paragraph 15, the phrase "Defendants had knowledge of the inability of the Care360 program to bill and collect for rural health care services" is stricken. This statement goes to an ultimate issue of fact for the jury. However, the remainder of that paragraph is consistent with Dr. Mumma's previous deposition testimony and describes only his own personal belief about what occurred after reviewing the June 6, 2011 e-mail. Paragraphs 16 and 17 are stricken in their entirety as argumentative interpretations of ultimate issues of fact.

In paragraph 18, the phrase "or had Defendants described truthfully to me the state of the Care 360 program" goes to an ultimate issue of fact and is stricken. The rest of paragraph 18 is admitted. Likewise, the phrase "which were false" to describe the representations of the Program to Plaintiff in Paragraph 19 is stricken as an ultimate issue of fact for the jury. The remainder of that paragraph is admitted. Paragraph 20 is also stricken. The entire paragraph is a conclusory assertion regarding an ultimate issue of fact. The phrase "As a direct and proximate result" is stricken from paragraph 21 as a legal conclusion. However, the remainder of paragraph 21 is admitted as consistent with prior testimony.

### 2.    Barbara Anders Affidavit

Defendants do not contest paragraphs 1–6, 8, and 9 of Ms. Anders' affidavit (ECF No. 42-2) and the Court finds that these paragraphs are legally sufficient. Accordingly, these paragraphs are admitted.

In paragraph 7, the last sentence—"These statements proved to be false."—is an ultimate issue of fact and is stricken. The remainder of paragraph 7 is admitted as consistent with prior

deposition testimony and based on Ms. Anders' personal knowledge.

Defendants object to Ms. Anders' statement in paragraph 10, "where it states that the Care360 program was not capable of billing or supporting rural health care billing." Again, the e-mail is in evidence and speaks for itself. Fed. R. Evid. 1002. Ms. Anders' characterization of what she believes the e-mail to say is stricken. The rest of paragraph 10 is admitted as consistent with prior deposition testimony and testimony based on access to new information.

Defendants argue that paragraph 11 should be stricken because it contradicts prior testimony by Ms. Anders that Mr. Mills was honest. The Court disagrees. In paragraph 11, Ms. Anders explains that her belief that Mr. Mills was honest changed based on her review of the June 6, 2011 e-mail from Mr. Kelly. Paragraph 11 is admitted as testimony based on access to new information. In paragraph 12, the phrase "concealed that information from Plaintiff" is stricken. This is an argumentative interpretation of an ultimate issue of fact. The rest of that paragraph is admitted.

Defendants object to paragraph 13 because "[w]hile Ms. Anders can testify to her own experience with the software, she cannot speculate as to whether the software functioned properly for other users." (Appendix C, 2, ECF No. 43-2). While the Court agrees with the basis for Defendants' objection, paragraph 13 seems to reference Plaintiff's individual experience with the Care360 Program. That paragraph is admitted in its entirety. Paragraph 14, however, is stricken in its entirety as an ultimate issue of fact. In paragraph 15, the clause "and actually misrepresented the Care360 program" goes to an ultimate issue of fact and is stricken. The rest of that paragraph is admitted. Finally, Paragraph 16 is stricken in its entirety as an argumentative interpretation of an ultimate issue of fact.

### 3. Ginger Pease Affidavit

Defendants do not contest paragraphs 1–6 of Ms. Pease's affidavit (ECF No. 42-6) and the Court finds that these paragraphs are legally sufficient. Accordingly, these paragraphs are admitted.

Defendants object to paragraph 7 as both a legal conclusion and based on a lack of personal knowledge. Based on her deposition testimony, Ms. Pease did not appear to have knowledge of what led to the purchase of the Care360 Program at the time the contract was signed. (Pease Depo., 28). Accordingly, paragraph 7 is stricken with the exception of the sentence, "The Care 360 program failed miserably." This last sentence is based on Ms. Pease's personal knowledge of how the Care360 Program performed.

In paragraph 8, Defendants object to Ms. Pease's statement, "I have recently been provided a copy of a June 6, 2011 email from Matt Kelly of Kareo, Inc. to David Mills . . . which explains that the Care 360 program needed significant programming upgrades and was unable to bill and support for rural health care services in its configuration that was being sold to Plaintiff." Again, this e-mail is part of the record and speaks for itself. Fed. R. Evid. 1002. Ms. Pease's characterization of what she believes it says is stricken starting at the phrase "which explains." However, the portion of paragraph 8 prior to that clause is admitted as consistent with prior deposition testimony and testimony based on access to new information. Paragraph 9 is stricken except for the first sentence. Again, Ms. Pease made it clear during her deposition that she had nothing to do with the purchasing decision of the Care360 Program. (Pease Depo., 40–41). As such, the rest of paragraph 9 is based purely on speculation, not personal knowledge. Paragraph 10 is admitted in its entirety, as it reflects only Ms. Pease's personal belief based on access to new information.

Defendants argue that paragraph 11 of Ms. Pease's affidavit contradicts her prior deposition testimony. The Court does not agree. Ms. Pease's testimony that she believed some claims were being rejected due to a change in the law and user error is not mutually exclusive from the fact that the Care 360 Program was also never able to bill rural healthcare claims. However, the Court does agree that Ms. Pease's statement, "Plaintiff's practice suffered severe damage as a result" is a legal conclusion. Paragraph 11 is admitted except for that clause.

**B.     Choice of Law**

A federal court exercising diversity jurisdiction is required to apply the choice of law rules of the state in which it sits. *Int'l Ins. Co. v. Stonewall Ins. Co*., 86 F.3d 601, 604 (6th Cir. 1996). Accordingly, Ohio's choice of law rules apply in this diversity case. In Ohio, the rights and duties of parties to a contract are determined by the law of the state that has "the most significant relationship to the transaction and the parties." *Ohayon v. Safeco Ins. Co. of Ill*., 91 Ohio St. 3d 474, 477, 747 N.E.2d 206, 209 (2001) (quoting Restatement (Second) of Conflict of Laws § 188(1)).

Crooksville Family Clinic is a professional corporation with its principle and only place of business in Ohio. (Compl., ¶ 2). Quest is a corporation with its principal place of business in New Jersey. (Answer, ¶ 3). At the time of this lawsuit, MedPlus was a wholly owned subsidiary of Quest. (*Id.* ¶ 4). Mr. Mills is an employee of Quest and a resident of Kentucky. (Mills Depo., 6, 13). The contract at issue in this case was undisputedly executed in Ohio and contains no forum selection clause. Although a conflict between Ohio law and the law of New Jersey could possibly exist, neither party has identified any relevant conflict. Moreover, both Plaintiff and Defendants consistently relied upon Ohio law in their memoranda. Consequently, the Court need not engage in a choice of law analysis at this point but will apply Ohio law. *See Wilkes Assocs. v.*

*Hollander Indus. Corp*., 144 F. Supp. 2d 944, 949 n.4 (S.D. Ohio 2001) (citing *ECHO, Inc. v. Whitson Co., Inc*., 52 F.3d 702, 707 (7th Cir. 1995) ("Where neither party argues that the forum state's choice-of-law rules require the court to apply the substantive law of another state, the court should apply the forum state's substantive law.")).

### C.     Breach of Verbal/Implied Contract

Defendants argue that Count IV fails because the Care360 contract is a fully-integrated agreement. "Under Ohio law, the court determines whether a sales contract is completely integrated by considering the four corners of the document and evidence extrinsic to the writing." *Watkins & Son Pet Supplies v. Iams Co*., 254 F.3d 607, 613 (6th Cir. 2001) (internal quotations omitted). "If a written contract is completely integrated, it is unreasonable as a matter of law to rely on parol representations or promises within the scope of the contract made prior to its execution." *Id.* at 612.

The Care360 Agreement executed by Plaintiff and Quest contains a clause, stating, "This Agreement constitutes the entire agreement between the parties with respect to the PMS Services, and supersedes all prior or contemporaneous negotiations or agreements, whether oral or written, related to this subject matter." (¶ 9, p. 17). Plaintiff does not present extrinsic evidence to show otherwise. Instead, it argues that because the specific function of billing and support for *rural* healthcare services was not specifically identified in the Care360 Agreement, the parties were free to enter into a verbal or implied agreement on this point. (Pl. Brief Opp., 16, ECF No. 42). This argument is wholly unsupported by the evidence.

Ms. Anders explained to Mr. Mills many times that the Care360 Program had to be able to perform rural healthcare billing for Plaintiff to agree to purchase it. (Anders Depo., 47–48). Similarly, when asked if he entered the Care360 Agreement to use Care360 for billing his rural

healthcare practice, Dr. Mumma responded in the affirmative. (Mumma Depo., 76). To say that the Care360 Agreement was meant to encompass some type of other billing is illogical. Moreover, according to Dr. Mumma's deposition testimony, there were no other written or oral agreements that Plaintiff had with Quest other than for lab services. (*Id.* at 93–94). The record only supports that the parties intended the Care360 Agreement to be a complete integration.

Accordingly, Defendants' Motion is **GRANTED** as to Count IV of the Complaint.

### D.    Limitation of Liability Clause

Defendants argue that the limitation of liability provision in the Care360 Agreement bars Count I (breach of contract), Count III (negligent misrepresentation), and Count V (unconscionable exculpatory clause) of the Complaint. Plaintiff responds that the limitation of liability clause is "oppressively one-sided" and cannot be enforced because Defendants' actions were an intentional, willful, or reckless breach of the Care360 Agreement. (Pl. Brief Opp., 16). Both parties cite the limitation of liability clause in the EHR section of the Care360 Agreement in their briefs. Because there is no dispute that the lawsuit relates solely to the alleged failure of the practice management product, the "Exclusion of Damages and Limitation of Liability" in the PMS services section of the Care360 Agreement is the governing provision. (Defs. Mot., 5, ECF No. 38; Mumma Aff., ¶ 6).

"Exculpatory clauses may be freely bargained for in Ohio." *Metropolitan Property and Casualty Ins. Co. v. Pest Doctors Sys., Inc.,* No. 3:14-cv-143, 2015 WL 4945767, at *8 (S.D. Ohio Aug. 20, 2015). "[A]bsent important public policy concerns, unconscionability, or vague and ambiguous terms, [limiting or exculpatory] provisions will be upheld, so long as the party invoking the provision has not committed a willful or reckless breach." *Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 969–70 (N.D. Ohio 1995) (internal quotations and citation omitted).

Because Plaintiff does not raise public policy concerns or vague and ambiguous terms as arguments against application of the limitation of liability clause at issue, the Court does not address them.

### 1. Unconscionability

"'Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party.'" *Metropolitan Property,* 2015 WL 4945767, at *8 (quoting *Collins v. Click Camera & Video, Inc*., 86 Ohio App. 3d 826, 834, 621 N.E.2d 1294, 1299 (Ohio Ct. App. 2d Dist. 1993)). This concept is divided into two requirements known as "procedural" and "substantive" unconscionability. *Id.* (citing *Hayes v. Oakridge Home*, 122 Ohio St. 3d 63, 67, 908 N.E.2d 408, 412 (Ohio 2009)). The unconscionability of a contract provision is a question of law and thus particularly appropriate for disposal on a motion for summary judgment. *Ins. Co. of N. Am. v. Automatic Sprinkler Corp. of Am*., 67 Ohio St. 2d 91, 98, 423 N.E.2d 151, 156 (Ohio 1981).

Although Plaintiff describes the limitation of liability clause as "oppressively one-sided" it makes no effort to articulate any underlying factual support for this statement. (Pl. Brief Opp., 16). As the party alleging unconscionability, Plaintiff bears the burden of proving a quantum of both procedural and substantive unconscionability. *Metropolitan Property*, 2015 WL 4945767, at *8. Plaintiff has not even attempted to meet that burden here.

Accordingly, the Court upholds the limitation of liability clause on this ground and **GRANTS** Defendants' Motion as to Count V. The limitation of liability clause is not unconscionable as a matter of law.

## 2.        Breach of Written Contract

The alleged breach of contract in this case is Defendants' failure to properly bill and collect for Plaintiff's services. (Compl., ¶ 36). Defendant argues that any breach of contract claim fails because termination of the Care360 Agreement was Plaintiff's sole remedy. Plaintiff argues that because Defendants "willfully and recklessly breached [the Care360 Agreement] by continuing to conceal information known as early as June 2011 that the Care360 program was incapable of billing rural health care services[,]" they are entitled to damages. (Pl. Brief Opp., 16).

Under the applicable limitation of liability clause, termination was not the sole remedy. Instead, the provision that applies to PMS services allows recovery for actions in contract "not [to] exceed the actual amount paid by you within the preceding 12 months under this agreement." (Care360 Agreement, ¶ 6, p. 16). Thus, if a jury finds that Defendants breached the Care360 Agreement, Plaintiff can collect monetary damages up to this contractual cap.

With regard to damages beyond what the limitation of liability clause allows, the analysis is more complex. "Under Ohio law, a limitation-of-liability clause is ineffective where the party to the contract seeking protection has engaged in wil[l]ful or wanton misconduct." *Superior Integrated Solutions, Inc. v. Reynolds and Reynolds Co.*, No. 3:09-cv-314, 2009 WL 4135711, at *3 (S.D. Ohio Nov. 23, 2009).

> Willful misconduct means intentionally doing that which is wrong or intentionally failing to do that which should be done. The circumstances must also disclose that the defendant knew or should have known that such conduct would probably cause injury to the plaintiff. It is a general rule that every person may be presumed to intend the natural and probable consequences of his acts. Willful misconduct implies . . . the performance of wrongful acts with knowledge of the likelihood of resulting injury. Knowledge of surrounding circumstances and existing conditions is essential; actual ill will or an intent to injure need not be present.

*Bush v. Cmty. Care Ambulance Network*, No., 2012-Ohio-4458, 2012 WL 4481299, at *4 (Ohio

Ct. App. 11th Dist. 2012) (citing Ohio Civil Jury Instruction, 401.41(1)). "A wil[l]ful or reckless breach is considered to be an intentional breach and is, thus, wil[l]ful misconduct." *Superior Integrated Solutions,* 2009 WL 4135711, at *3.

There is no dispute Mr. Mills did not relay the contents of his June 6, 2011 conversation with Mr. Kelly to Plaintiff. (Mills Depo., 121). Rather, Mr. Mills told Ms. Anders that rural healthcare billing "would be no problem." (Anders Depo., 48; Mills Depo., 52). But this statement occurred before the parties entered into the contract.

After execution of the Care360 Agreement, Mr. Mills went out to the Clinic on several occasions to assist with trouble-shooting and according to Dr. Mumma, worked diligently to try to resolve the issues. (Anders Depo., 53; Mumma Depo., 74. 82). Mr. Mills was in constant contact with Kareo to make sure they working with Plaintiff. (Mills Depo., 69). He also reached out to his supervisor to let him know about the financial problems Plaintiff faced as a result of the failures of the Care360 Program. (*Id.* at 95–96). Ms. Anders believed Mr. Mills was doing all he could to help but the problems with the PMS service were not his problems to fix. (Anders Depo., 54).

Moreover, Kareo's customer support relayed mixed messages to both Mr. Mills and Ms. Anders directly regarding whether the Care360 Program would ever be able to successfully bill for rural healthcare claims. (Anders Depo., 49, 53–54, 131–34; Mills Depo., 69, 147). Whether Mr. Mills continued to "conceal" the information contained in the June 6, 2011 Kareo e-mail from Plaintiff became irrelevant post-contract. Ms. Anders was equipped with information even more damaging than contained in the e-mail: "[Kareo] told [her] they could not correct the problem." (Anders Depo., 131). There is no evidence to support that Mr. Mills engaged in willful or wanton misconduct after execution of the contract, so as to invalidate the contractual

limitation of liability.

Accordingly, Count I is not precluded by Quest's limitation of liability clause. If a jury finds Defendants committed a breach of contract, Plaintiff may recover up to the amount paid to Quest/MedPlus[4] under the Agreement in the preceding 12 months. Accordingly, the Court **DENIES** Defendants' Motion as to Count I of the Complaint against Quest/MedPlus but **GRANTS** it as to David Mills.[5]

### 3. Negligent Misrepresentation

Defendants argue that Plaintiff's negligent misrepresentation claim fails because it is also barred by the limitation of liability clause and if it is not, Plaintiff cannot show that Defendants failed to exercise reasonable care, the misrepresentation concerned a future event, and the parties lacked a "special relationship." Plaintiff responds that there is abundant evidence in the record to support the claim.

For the same reasons that recovery on Plaintiff's breach of contract claim is not precluded by the limitation of liability clause, Plaintiff's negligent misrepresentation claim is also not barred. Similar to contract actions, the clause limits recovery for actions in tort relating to PMS services to the amount paid by Plaintiff to Quest/MedPlus. (Care360 Agreement, ¶ 6, p. 16).

Moving to the substance of Plaintiff's claim, the Supreme Court of Ohio defines

---

[4] Defendants Quest and MedPlus, Inc. are now collectively known as "Quest Diagnostics Clinical Laboratories, Inc." (Defs. Motion, 1, ECF No. 38).

[5] "The well-settled rule in Ohio is that an agent who contracts with a third party on behalf of a disclosed principal, and as the authorized agent of that principal, is not personally liable on the contract." *Eaton v. Continental General Ins. Co.*, 147 F. Supp. 2d 829, 837 (N.D. Ohio 2001). There is no dispute that Plaintiff entered into the Care360 Agreement with Quest and that Mr. Mills was not a party to that contract. (Care360 Agreement, Defs. Ex. 2, ECF No. 31; Mumma Depo., 94). Moreover, Plaintiff was fully aware that Mr. Mills worked for Quest. (Anders Depo., 43; Mumma Depo., 61–62). Thus, Quest was a disclosed principal and Mr. Mills was its agent.

negligent misrepresentation as:

> "One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information."

*Nat'l Mulch and Seed, Inc. v. Rexius Forest By-Products, Inc.*, No. 2:02-cv-1288, 2007 WL 894833, at *5 (quoting *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 4, 534 N.E.2d 835, 837 (Ohio 1989)).

There is no question that Mr. Mills was acting in the course of his employment at Quest in selling the Care360 Program to Plaintiff in order to make a profit, including a bonus or commission. (Mills Depo., 22, 63). Mr. Mills arguably told Ms. Anders that rural billing "would be no problem" in order to persuade Plaintiff to purchase the Care360 Program. (Anders Depo., 44, 48, 55). There is also evidence in the record that Plaintiff would not have purchased the Care360 Program if it were not for Mr. Mills' statement. (*Id.* at 130). Moreover, there is a genuine dispute as to whether Ms. Anders obtained similar information from Kareo prior to entering the contract. (*Id.* at 108–13). Comparing the June 6, 2011 e-mail from Mr. Kelly to Mr. Mills and Mr. Mills' statement that rural healthcare billing "would be no problem," a reasonable juror could determine that Mr. Mills' statement was false and that he failed to exercise reasonable care or competence in communicating the information from Kareo to Plaintiff. (*Compare* Pl. Ex. 2, ECF No. 36 *with* Mills Depo., 52–53).

Defendants' argument that Plaintiff's claim fails because the parties were engaged in an arms-length business transaction, which does not qualify as a "special relationship," is also without merit. This Court previously held that "a special relationship is not a formal element of a negligent misrepresentation claim under Ohio law." *Nat'l Mulch*, 2007 WL 894833, at *9.

Rather, "[a] number of Ohio courts have been confronted with a claim for negligent misrepresentation where the information was supplied to the opposite party in a business transaction. The majority of these cases do not support a determination that information supplied to a person in the course of a business transaction cannot be supplied for that person's guidance." *Id.* at *11.

The Court went on to explain that, "[t]o the extent Ohio courts discuss a special relationship in connection with a negligent misrepresentation claim, the discussion appears to be related to the requirement that a defendant supply false information for the guidance of the plaintiff in its business transactions." *Id.* at *9. The language "for the guidance of" within the cause of action "directs the court's attention to the duty owed and serves to limit the class of potential plaintiffs." *Id.* In other words, liability for negligent misrepresentation is limited to "'the person or one of a limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it.'" *Id.* (quoting *Gutter v. Dow Jones, Inc*., 22 Ohio St. 3d 286, 288, 490 N.E.2d 898, 900 (Ohio 1986)). The record is clear that Mr. Mills intended to relay that rural healthcare billing through the Care360 Program "would be no problem" only to Ms. Anders, acting on behalf of Plaintiff. *Cf. id.* at *10 (explaining that "a person may not maintain an action for negligent misrepresentation when the alleged misrepresentation is intended to reach an extensive, unresolved class of persons").

Defendants also argue that Plaintiff's negligent misrepresentation claim cannot survive because the allegedly false statement "there would be no problem" concerns a future event. "However, a promise made with a present intention not to perform is a misrepresentation of an existing fact even if the promised performance is to occur in the future." *Yo-Can, Inc. v. The Yogurt Exchange, Inc*., 149 Ohio App. 3d 513, 525, 778 N.E.2d 80, 89 (Ohio Ct. App. 7th Dist.

2002). In the light most favorable to Plaintiff, Mr. Mills' statement to Ms. Anders about the Care 360 Program's ability to handle rural healthcare billing can reasonably be interpreted as a misrepresentation of an existing fact. There is evidence to support that, at best, Mr. Mills was negligent to the fact that supporting rural healthcare billing would be more complicated than he represented during his initial discussion with Ms. Anders. And, at worst, that he knew the Care360 Program would not be able to perform as represented. *See Stuckey v. Online Resources Corp.*, 819 F. Supp. 2d 673, 688–89 (S.D. Ohio 2011) (finding that the defendant's promise to file a registration statement within a certain timeframe while knowing that a pending SEC review would preclude the registration from being declared effective was a promise concerning a future action that the defendant had no present intention to keep). Moreover, the Court is not convinced that because Mr. Mills used the word "would" during his conversation with Ms. Anders, that took the discussion about the Care 360 Program's ability to bill rural healthcare out of the present tense and converted it into a future promise.

Accordingly, the Court **DENIES** Defendants' Motion as to Plaintiff's negligent misrepresentation allegation in Count III. However, any recovery is limited to the actual amount paid by Plaintiff under the Agreement in the preceding 12 months.

### E.     Fraud Claims

In Count II (fraud in the inducement), Plaintiff argues that Mr. Mills fraudulently induced Plaintiff to enter into the Care360 Agreement when he mispresented to her several times that "there would be no problem" billing rural healthcare claims. (Mills Depo., 52–53; Anders Depo., 48). In Count III (fraudulent misrepresentation),[6] Plaintiff alleges that Defendants "made

---

[6] Intentional misrepresentation forms the basis for the cause of action for fraud in this case. As such, it will be treated as an element of fraud, not as a separate claim. *Applegate v.*

material and misleading representations to Plaintiff about its ability to perform and expertise in providing the services as set forth in the Agreement." (Compl., ¶ 50). Specifically, Mr. Mills "made this representation during his initial presentation . . . and repeatedly thereafter during the period of the Agreement by telephone to Barb Anders and when he came out to Plaintiff's site." (*Id*).

Under Ohio law, the elements for both fraud in the inducement and fraudulent misrepresentation[7] include:

> "(1) a representation or, where there is a duty to disclose, concealment of a fact, (2) which is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance."

*Williams v. CitiMortgage, Inc*., 498 Fed. Appx. 532, 534 (6th Cir. 2012) (quoting *CitiMortgage, Inc. v. Hoge*, 196 Ohio App. 3d 40, 48, 962 N.E.2d 327, 333 (Ohio Ct. App. 8th Dist. 2011)). Fraud in the inducement relates "'not to the nature or purport of the [agreement] but to the facts inducing its execution.'" *Patel v. Univ. of Toledo*, 95 N.E.3d 979, 989–90 (Ohio Ct. App. 10th Dist. 2017) (alteration in original) (quoting *Haller v. Borror Corp.*, 50 Ohio St. 3d 10, 14, 552 N.E.2d 207, 210 (Ohio 1990)). There is no dispute as to elements one, two, and six of Plaintiff's fraud claims. Rather, Defendants argue that both counts should be dismissed because there is no evidence to support that there was knowledge of the falsity of the misrepresentation, intent to mislead/induce reliance, or justifiable reliance.

---

*Northwest Title Co.*, 2004-Ohio-1465, 2004 WL 585592, at *1 n.2 (Ohio Ct. App. 10th Dist. 2004).

[7] The claims of fraud in the inducement and fraudulent misrepresentation have identical elements. *Vancrest Mgt. Corp. v. Mullenhour*, 2019-Ohio-2958, 2019 WL 3282772, at *6 (Ohio Ct. App. 3d Dist. 2019); *Boyd v. Archdiocese of Cincinnati*, 2015-Ohio-1394, 2015 WL 1600303, at *5 n.5 (Ohio Ct. App. 2d Dist. 2015).

### 1.     Fraud in the Inducement

There is no dispute that Mr. Mills e-mailed Kareo to determine whether the Care360 Program could handle rural healthcare billing prior to Plaintiff entering the contract. (Mills Depo., 50–52). However, there is quite a discrepancy between Mr. Kelly's e-mail response back to Mr. Mills and Mr. Mills' statement to Ms. Anders that "there would be no problem" billing for rural healthcare claims. (*Compare* Pl. Ex. 2, ECF No. 36 *with* Mills Depo., 52–53). While none of Plaintiff's staff believed Mr. Mills' statement was intentionally false at the time of their depositions, no one at the Clinic was privy to the e-mail communication between Mr. Mills and Mr. Kelly at that time. (*Compare* Anders Depo., 93, Pease Depo., 75–76; Mumma Depo., 73; *with* Mumma Aff., ¶¶ 13, 15; Anders Aff., ¶¶ 10–12; Pease Aff., ¶¶ 8, 10). In light of the Kareo e-mail, whether Mr. Mills' statement was false, and whether he knew it was false or he was reckless as to its truth, are questions for a jury.

Similar to element three, a reasonable juror could conclude that Mr. Mills intended to induce Plaintiff to enter the contract by claiming that rural healthcare billing would not be a problem, instead of relaying the complexity of what Kareo had actually stated regarding the Care360's Program's capabilities. Ms. Anders made it clear to Mr. Mills that a billing program's inability to bill rural healthcare would be a deal breaker. (Anders Depo., 44, 47–48, 55). Both Dr. Mumma and Ms. Anders stated that they would not have entered into the Care360 Agreement if they would have known the details of the e-mail from Mr. Kelly. (Mumma Aff., ¶ 18; Anders Depo., 130–31). There is no dispute that Mr. Mills made a commission or bonus off the sale of the Care360 Program. (Mills Depo., 63). Whether Mr. Mills intended to induce Plaintiff to enter the Care360 Agreement based on his repeated assurance that "there would be no problem" is also a question for the jury.

There is also a genuine issue of fact as to whether Ms. Anders justifiably relied on Mr. Mills' representation in entering the Care360 Agreement. According to Ms. Anders, Plaintiff "would never, ever have gone with 360 if we hadn't been told [by Mr. Mills] that there would no problem with our Rural Health Care billing." (Anders Depo., 130–31). Defendants argue that Ms. Anders also reached out to Kareo and was told that the Care 360 Program could handle rural healthcare billing. However, the timing of that communication is not clear from the record. While Mr. Mills testified that Ms. Anders reached out to Kareo prior to execution of the contract and was told rural healthcare billing would not be a problem by Kareo, Ms. Anders recalled that being during her training on the Care 360 Program after the contract was signed. (*Compare* Mills Depo., 52, 65 *with* Anders Depo., 108–13).

Finally, Defendants argue that the fraud in the inducement claim must fail because Mr. Mills' statement that "there would be no problem" regarding the Care360 Program's ability to handle rural healthcare billing concerned a future event. This argument fails for the same reason discussed above in Section III.D.3.

Accordingly, Defendants' Motion is **DENIED** as to Count II of the Complaint.

## 2. Fraudulent Misrepresentation

With regards to Count III, Plaintiff makes the same allegation as in Count II regarding Mr. Mills' pre-contract representation to Mr. Mills that rural healthcare billing "would be no problem." Because the elements for both fraud in the inducement and fraudulent misrepresentation are the same, Count III survives as it relates to this particular allegation for the same reason as Count II. Therefore, the Court moves to the analysis of the remainder of Plaintiff's allegations in Count III.

Plaintiff argues that after execution of the contract, Mr. Mills continued to make

fraudulent assurances that the issues with the Care360 Program were being resolved when they were not and "continued to attempt to conceal from CFC the obvious failure of the Care360 program" in an effort to prevent Plaintiff from attempting to seek another solution, including an earlier termination of the contract. (Pl. Brief Opp., 12). Defendants argue that there can be no justifiable reliance on any of Mr. Mills' statements post-contract because "the Clinic had access to the same information from Kareo as Defendants regarding the capabilities of the Care360 system[.]" (Reply, 15, ECF No. 43).

The record provides that after execution of the Care360 Agreement, Ms. Anders communicated directly with both Kareo's customer support and Mr. Mills on a regular basis about Plaintiff's billing problems. (Anders Depo., 54, 98). And both parties reassured Ms. Anders that the billing problem was being fixed.

- "But I can remember . . . [a]s the problems were going on, [Mr. Mills] would stop in and he would reassure me again that they could get this problem taken care of." (*Id.* at 53).
- "And as the time went on - - I mean . . . you got to where you weren't really believing what [Mr. Mills] was saying because he had told you many times that they were going to fix this; that it was going to be corrected. And it wasn't happening." (*Id.* at 54).
- "We were doing anything and everything. And we just kept jumping through hoops that [Kareo] would tell us to do. You do this, and we'll have this corrected. You do that, and we'll have this corrected. And it was never done." (*Id.* at 56).
- "David was assuring me that this was not a problem; that it was going to be okay, it would go smoothly." (*Id.* at 113).
- "Care360 told me many times that they had all of our problems taken care of." (*Id.* at 114).
- "[T]here were two or three times I was promised that it would be corrected [by Kareo]." (*Id.* at 131–32).
- "I mean one time [Kareo] would be all . . . yeah, sure, we will get this taken care of, it won't be a problem." (*Id.* at 134).

Moreover, according to Ms. Anders, it was not Mr. Mills' job to correct or fix the problem, rather "Care360, Kareo, whoever it was that was supposed to do this was not doing it." (*Id.* at 54).

Similarly, while it is undisputed that Mr. Mills did not forward any e-mails from Kareo to Plaintiff that stated that the Care360 Program could not support rural healthcare billing post-contract, Kareo relayed the same information directly to Ms. Anders several times. (Mills Depo., 143–45).

- Kareo said "[w]e can't do that" referring to when Ms. Anders called customer service and told them what they needed to do to be able to perform rural healthcare billing. (Anders Depo., 49).
- "[Kareo] told me they could not correct the problem[.]" (*Id.* at 131).
- "[T]he concept that I got when I spoke to [Kareo] . . . was that they were trying to set up a system through the whole United States, like 360 would handle . . . any type of billing that you did. But what they had set up, they were not willing to modify to help if you had a problem. In other words, you went with it the way it was set up or you just were out of luck." (*Id.* at 132).
- "I just told [Kareo], I said, you can do it. You just have to be willing to. And I didn't get anything beneficial to us." (*Id.* at 133).
- "This was really late when [Kareo] finally said they weren't going to do it or they couldn't do it or whatever. We had been through all kinds of promises, all kinds of yes, we will get this taken care of, it will be fixed." (*Id.*).
- "And the next time, they[—referring to Kareo—]are you are an idiot attitude to think that we will do this." (*Id.* at 134).

Because "[a] person has no right to rely on misrepresentations when the true facts are equally open to both parties[,]" a reasonable juror could not find that Plaintiff justifiably relied on Mr. Mills' assurances that the billing solution was being resolved or "concealments" that it was not. *Columbia Gas Transmission Corp. v. Ogle,* 51 F. Supp. 2d 866, 875–76 (S.D. Ohio 1997); *see also Takis, LLC v. C.D. Morelock Properties, Inc.*, 180 Ohio App. 3d 303, 308, 905 N.E.2d 204, 254 (Ohio Ct. App. 10th Dist. 2008).

Accordingly, with regard to the fraudulent misrepresentation allegation in Count III, the Court **DENIES** Defendants' Motion as to Mr. Mills' pre-contract representation to Plaintiff and **GRANTS** it as to any post-contract representations made to Plaintiff.

Because Counts II and III seek to recover damages under the exact same factual and legal

basis, the Court will merge the claims for purposes of trial. *See General Tel. Co. of the Northwest, Inc. v. EEOC*, 446 U.S. 318, 332 (1980) ("[T]he courts can and should preclude double recovery by an individual."); *Hudson v. Insteel Industries, Inc*., 5 Fed Appx. 378, 387 (6th Cir. 2001) ("It is well-established that when a party is entitled to recovery of the same damages under separate causes of action, the trial court may allow recovery only once.").

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment (ECF No. 38).

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison
SARAH D. MORRISON
UNITED STATES DISTRICT JUDGE